Robert D. Sherlock (Utah Bar No. 02942)
Jeffrey Oritt (Utah Bar No. 2478)
EISENBERG, GILCHRIST & CUTT
215 South State Suite 900
Salt Lake City, Utah 84111
Telephone:      801-366-9100
Facsimile:      801-350-0065
rsherlock@egclegal.com
joritt@egclegal.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

### NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *ex. rel.* <br><br> MICHELLE BOUCHER, P.A. <br><br>          Plaintiff-Relator, <br><br>      v. <br><br> KPM CAPITAL, LLC dba WESTERN MEDICAL GROUP ; KMR MEDICAL LLC ; JODY ROOKSTOOL ; BENJAMIN GEORGE ; DAVID NOLAN ;  JOHN DOES #1-100, FICTICIOUS NAMES <br><br>         Defendants. | **COMPLAINT** <br><br> **Jury Trial Requested** <br><br> **FILED UNDER SEAL** <br> **Pursuant to the False Claims Act,** <br> **31 U.S.C. § 3730** *et seq.* |

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 6

I.      **JURISDICTION AND VENUE** ........................................................8

II.     **PARTIES** ............................................................................................8

        A.  RELATOR ...........................................................................8

        B.  DEFENDANTS .....................................................................9

                1.    KPM Capital LLC, DBA Western Medical Group............................9

                2.    KMR Medical, LLC ...........................................................9

                3.    Jody Rookstool. ..............................................................10

                4.    David Nolan ..................................................................11

                5.    Benjamin George............................................................11

                6.    John Does 1-100.............................................................12

III.    **STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS'FALSE CLAIMS ACT VIOLATIONS** ................................12

        A.  THE FALSE CLAIMS ACT ..................................................12

        B. FEDERAL GOVERNMENT HEALTH PROGRAMS..............................14

                1. Medicare................................................................14

                2. Medicaid................................................................14

3. Tricare.................................................................15

4. Veterans Administration...........................................15

5. Federal Employees Health Benefits Programs.................15

C. THE MEDICARE ANTI-KICKBACK STATUTE ..................................16

D. MEDICARE REQUIREMENTS FOR PAYMENT OF CLAIMS (42 CFR 424.32)..............17

E. MEDICARE DOCUMENTATION AND PHYSICIAN PRESCRIPTION REQUIREMENTS FOR DME.........................................................................18

F. PROHIBITION ON ROUTINE WAIVERS OF BENEFICIARY CO-PAYMENTS AND DEDUCTIBLES.............................................................19

G. MEDICARE REQUIREMENTS FOR COVERAGE AND PAYMENT FOR DURABLE MEDICAL EQUIPMENT ...........................................................20

H. MEDICARE'S DME "COLD CALLING" PROHIBITION ........................20

I. NATIONAL PROVIDER IDENTIFIER NUMBERS................................21

J. MEDICAL NECESSITY.................................................... 22

IV.    SPECIFIC FRAUDULENT ACTS AND OMISSIONS OF DEFENDANTS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT.....................................23

A. CHRONOLOGY........................................................23

B. Specific Examples of Sales/Claims to Medicare in Furtherance of the Scheme ........................................................................................................31

C. Scheme to make Repeated Unsolicited Calls to Medicare Beneficiaries .....33

D. Specific Examples of the Fraudulent Statements Made by Defendants' Employees at the Direction of Defendants in order to Carry out the Scheme...................................................................................................34

E. Scheme to Cause the Medicare Beneficiary's Treating Provider to Provide "Prescriptions" for the DME by False Representations............................36

F. Defendants Submission of Claims and False Certifications of Compliance with Medicare Regulations and Conditions of Payment ................................36

V. DEFENDANTS' RETALIATION AGAINST RELATOR FOR MAKING MANAGE-MENT AWARE OF SPECIFIC AND MATERIAL VIOLATIONS OF FEDERAL LAW   AMOUNTING TO CRIMINAL ACTS ..............................................38

VI. SCOPE OF THE FRAUD.........................................................................39

VII. CLAIMS FOR RELIEF.........................................................................40

COUNT I –VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)...............................40

COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)...............................41

COUNT III – VIOLATION OF 31 U.S.C. 3729(a)(1)(C)................................42

COUNT IV – VIOLATION OF 31 U.S.C. 3730(h)………..…………..…………..…….43

**VIII. PRAYER FOR RELIEF**…..……………………………………..…….…………..45

**IX. REQUEST FOR TRIAL BY JURY**……………………………….…………..46

## INTRODUCTION

1.  On behalf of the United States of America,  and pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733, Relator brings this action against Defendants for treble damages and civil penalties arising from Defendants' conduct in violation of the Federal Civil False Claims Act.

2.  This action concerns improper and unlawful billing of Federal payors by Defendants KPM Capital LLC, DBA Western Medical Group,  KMR Medical LLC,  Jody Rookstool, Benjamin George, David Nolan and others at their facilities in Utah County, Utah. In an attempt to increase its profile and generate profits, Defendants KPM Capital LLC, DBA Western Medical Group, KMR Medical LLC,  Jody Rookstool, Benjamin George, David Nolan and others, created and implemented a number of schemes to knowingly and intentionally create an "enterprise" to "mass market" off-the-shelf knee and back braces to Medicare patients.

3. As further described herein, this mass marketing consisted of unsolicited telephone contact by a contracted or partner organization in Cebu, Philippines, which then transferred the calls to Defendant's enterprise in American Fork, Utah, under the ruse that these were "inbound" calls. These knee and back braces (similar to what one can buy at a drugstore) were then marketed to Medicare beneficiaries with a promise that they would have "absolutely no out-of-pocket cost."

4.  Defendants thus have a continuing relationship with business entities and individuals in Cebu, Philippines. However, all sales to Medicare beneficiaries under the current enterprise are conducted, and the items shipped, from American Fork, Utah.

5. Additionally, these items are being sold and billed to Medicare under National Provider Identification Numbers assigned to Defendants enterprises under different names and organization than those ostensibly making the sale, and in at least one case the enterprise to which the number is assigned was voluntarily dissolved. These enterprises are ongoing and potentially resulting in between 1.7 and 2 million dollars per day in sales to unsuspecting Medicare beneficiaries, fraudulently billed to Medicare. In Defendants' experience, the Medicare beneficiaries pay no required co-payments or deductibles, and the money is received solely from Medicare for these items.

6. Relator discovered these violations in the course of her employment and interactions with physicians participating in these schemes and conducted their own investigations in furtherance of a False Claims Act *qui tam* action. She brings this action on behalf of the United States to recover damages for the false claims that have been and continue to be submitted. The anticipated litigation concerns Defendants' violations of the False Claims Act (31 U.S.C. §§ 3729 et seq.), and the Federal Anti-Kickback law (42 U.S.C. §§ 1320a-7(b)).

## I.   JURISDICTION AND VENUE

7. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732. This Court has supplemental jurisdiction over the counts relating to the state False Claims Acts pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants can be found in and transact business in this District.  Additionally, this

Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. §3729 occurred in this District. 31 U.S.C.§3732(a).

9. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

10. Relators' claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

11. To the extent that there has been a public disclosure unknown to the Relators, Relators are "original source[s]" and meet the requirements under 31 U.S.C. § 3730(e)(4)(B). To the extent there has been a public disclosure of any facts or other matters relevant to this Complaint, Relators allegations herein are based on their knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions (if any) and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).


## II. PARTIES

### A. RELATOR

12. Relator Michelle Boucher is a Physician's Assistant and was employed by Defendant for approximately 4 weeks. Relator Boucher is an individual, residing in Utah County, State of Utah. She applied for a position with Western Medical pursuant to their advertisement for

telephone sales representatives ("reps" or "Representatives") for Defendants' durable medical equipment company.

13. She was hired for the position and received her training for Defendants' Enterprise on December 6 and 7, 2013. Her last day of effective employment was January 8, 2014, at which time she was placed on "administrative leave" and thereafter terminated from employment as a direct result of her raising facts concerning the company's violation of Medicare rules and Federal law with the company's vice president of sales, David Nolan.

14. As a result of her direct involvement in the processes and events described herein, Relator Boucher has direct and independent knowledge of the false statements and claims that Defendants caused to be submitted to the Government.

B. DEFENDANTS

15. Defendant KPM Capital, LLC, is a Utah Limited Liability Company doing business as "Western Medical Group." Both the DBA and KPM Capital, LLC, are registered with the Utah Division of Corporations.  They do business from a headquarters in American Fork, Utah. The central location of their call center and distribution of products sold to Medicare beneficiaries under the schemes detailed herein, all take place in Utah County, State of Utah.

16. Defendant KRM Medical, LLC, was a Utah Limited Liability Company. It was voluntarily dissolved by its manager, Defendant KPM Capital, LLC, as of 1 August 2013 in documents filed with the Utah Division of Corporations. However, KMR Medical continues to do business in the schemes detailed herein; the National Provider Identification Number  (NPI)

under which KPM Capital, LLC, DBA Western Medical Group, and the other defendants identified herein carry out the fraudulent schemes is actually registered and assigned to Defendant KMR Medical, LLC. Based on information available to the Relator, no attempt to reassign this number, modify or amend the entity or individuals to whom it is assigned, or other changes to the NPI registered, as required by federal law have been made. Thus, Defendant KMR Medical, LLC, continues to do business in the schemes described herein despite its voluntary dissolution in the State of Utah.

17. Defendant Jody Rookstool is an individual and believed to be a resident of Utah County, State of Utah. He is the Chief Operating Officer of Defendant KPM Capital, LLC, recognized within the Western Medical Group Enterprise as the top official, and registered as a manager of KPM Capital, LLC. Relator believes, on the basis of numerous conversations and understandings within her former workplace at Western Medical Group that Defendant Rookstool is the prime architect of the schemes alleged herein, and conspired with the entities and other individuals to create the fraudulent schemes described herein.

18. The Defendants and their enterprises actually operate under four National Provider Identifier numbers.

19. Provider NPI number 1477828804 was issued and last updated on 3/19/2012. It is assigned to "KMR Medical LLC." The authorized official is Tim Watson.

20. Provider NPI number 1326479494 is assigned to a provider, "Arizona Medical Supply" and "Senior First Medical." This was issued and last updated on 10/27/2013. The authorized official is Defendant Jody Rookstool.

21. Provider NPI number 1881656114 is assigned to "Arizona Medical Supply and "Western Medical." This was last updated 4/26/2013. The authorized official is Defendant Jody Rookstool.

22. Provider NPI number 1710233747 is assigned to "KMR Medical Supply." It was last updated 3/27/2012, and authorized official is Defendant Jody Rookstool.

23. Relator is informed and believes that Defendants may be billing under all of these numbers in order to keep their massive volume of sales less visible to CMS auditors.

24. Defendant Benjamin George is an individual and believed to be a resident of Utah County, State of Utah. He is the Chief Operating Officer of Defendant KPM Capital, LLC, recognized within the Western Medical Group Enterprise as the top official, and registered as a manager of KPM Capital, LLC. Relator believes, on the basis of numerous conversations and understandings within her former workplace at Western Medical Group that Defendant George is a prime architect of the schemes alleged herein, and conspired with the entities and other individuals to create the fraudulent schemes described herein.

25. Defendant David Nolan is an individual residing in the State of Utah and Utah County. Defendant Nolan is employed by the fraudulent enterprise consisting of KMR Medical LLC, KPM Capital LLC DBA Western Medical and the other individuals identified herein. David Nolan's title is Vice President of Sales. As described herein David Nolan played an active and personal role in teaching new employees how to carry out the fraudulent scheme, indicated that he knew the scheme was fraudulent, and other actions.  Relator is informed and believes and alleges that Nolan played an additional role in the enterprise,  i.e., that of "enforcer," using tactics up to and including threats of physical violence to keep individuals attached to the

11

enterprise or silent about its operating methods. He was known to use "Mafia-related" references to keep people within the "family" (a term he used in his "enforcer" role).

26. John Does #1-100, fictitious names, are unknown co-conspirators who together with the Named Defendants also participated in and/or conspired to perpetuate the scheme described herein.  To the extent that any of the conduct or activities described in this Disclosure Statement and the accompanying Complaint in this matter were not performed by Defendants, but by the individuals described herein as John Does #1-100, fictitious names, the term "Defendants" shall also refer to John Does #1-100.

27.  For purposes of this Disclosure Statement and the Complaint, the individuals identified herein together with the overlapping entities, holders of NPI numbers, interlocking business entities, and contractors (e.g. the Cebu, Philippines call center co-conspiring with Defendants as identified below) are collectively referred to as "Defendants' Enterprise," or simply the "Enterprise."

## III. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. THE FALSE CLAIMS ACT

28. The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(A),(B) & (C). The False Claims Act

provides:

*(a) Liability for Certain Acts.—*

*(1) In general.— Subject to paragraph (2), any person who—*

*(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;*

*(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;*

*(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . .*

*is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410  [1] ), plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .*

*(b) Definitions.— For purposes of this section—*

*(1) the terms "knowing" and "knowingly"—*

*(A) mean that a person, with respect to information—*

*(i) has actual knowledge of the information;*

*(ii) acts in deliberate ignorance of the truth or falsity of the information; or*

*(iii) acts in reckless disregard of the truth or falsity of the information; and*

*(B) require no proof of specific intent to defraud;*

*(2) the term "claim"—*

*(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—*

*(i) is presented to an officer, employee, or agent of the United States; or*

*(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—*

*(I) provides or has provided any portion of the money or property requested or demanded; . . .*

*(4) the term "material" means having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property.*

29. The False Claims Act further provides that the Relator shall receive an amount which

the court decides is reasonable for collecting the civil penalty and damages. The amount is not

less than 15% and not more than 25% of the proceeds of the action (if the Government

intervenes in the case). If the Government does not intervene, the amount is not less than 25%

nor more than 30% of the proceeds of the action. The Relator shall also receive an amount for

reasonable expenses, and reasonable attorney's fees and costs. All such expenses, fees and costs

shall be awarded against the Defendants.

B. FEDERAL GOVERNMENT HEALTH PROGRAMS

30. Based on Relator's knowledge, the primary healthcare program to which Defendants

submitted claims, was, and is, Medicare. However, since representatives were directed to also

gain information on secondary payors (such as Medicare supplements, etc.), Defendants likely

have submitted bills to other government payors as well. These payors may have included

Medicaid, Tricare, Veteran's Administration and Federal Employees Health Benefit Programs.

31. Medicare is a federal Government health program primarily benefiting the elderly

that Congress created in 1965 when it adopted Title XVIII of the Social Security Act. Medicare

is administered by the Centers for Medicare and Medicaid Services ("CMS").

32. Congress created Medicaid at the same time it created Medicare in 1965 when Title

XIX was added to the Social Security Act. Medicaid is a public assistance program providing

payment of medical expenses to low-income patients.  Funding for Medicaid is shared between

the federal Government and state Governments.  The federal Government also separately

matches certain state expenses incurred in administering the Medicaid program. While specific

14

Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

33. Tricare is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and career military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. Tricare is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits. Five managed care support contractors create networks of civilian health care providers.

34. Whereas Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics.

35. The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than eight (8) million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.

C. The Medicare Anti-Kickback Statute 42 U.S.C. §1320a-7b(b).

36. The Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare, Medicaid and TRICARE programs. In pertinent part, the statute states:

> *Whoever knowingly and willfully offers or pays [or solicits or receives] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony.  42 U.S.C. §1320a-7b(b).*

37. Under 42 U.S.C. 1320a-7a(i)(6),  The term "remuneration" includes the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value. Exceptions occur only in limited circumstances not relevant to this case.

38. Violations of the Anti-Kickback Act are specifically actionable under the False Claims act.  42 U.S.C. § 1320(a)-7b(g) states:

> *(g) Liability under subchapter III of chapter 37 of title 31:*
>
> *In addition to the penalties provided for in this section or section 1320a–7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31.*

42 U.S.C. § 1320(a)-7b(g)

D. MEDICARE REQUIREMENTS FOR PAYMENT OF CLAIMS (42 CFR 424.32)

39. The Medicare requirements for the payment of claims are contained in 42 CFR Sec.

424.32, et.seq. These regulatory provisions provide a basic, high level overview of requirements

for the payment of claims, which are supplemented under regulatory authority under additional

Medicare guidance contained in program memoranda, Medicare claims processing manuals,

Medicare provider manuals and the like. All persons or entities participating in the Medicare

program receive copies of these documents or guidance on where to locate them in online

sources. Other payors including Tricare and Medicaid use identical or very similar provisions as

guidance. Medicare provisions for the payment of claims including coding protocols, forms, and

the like are considered industry standard in the health care industry.

(a) A claim must meet the following requirements:

i. A claim must be filed with the appropriate Medicare Administrative Contractor

on a form prescribed by CMS in accordance with CMS instructions .

ii. A properly completed claim must be on a prescribed form (or electronic

equivalent), signed by the beneficiary or on behalf of the beneficiary (in

accordance with § 424.36). For Durable Medical equipment this is a CMS-1500.

Iii. In submitting the claim form, the billing entity certifies (among other

certifications) as follows:

"*I certify that the services shown on this form were medically indicated*

> *and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."*

40. Medicare's reimbursement to providers varies depending on the type, level and complexity of the services rendered. This information is reflected in the CPT code or HCPCS code included in the claim submitted to the local carrier. Relator Boucher is informed and believes that Defendant's Enterprise submits its claims to the local carriers electronically, and its billing office is centralized at its home office.

41. Before the Medicare carriers accept electronically-submitted claims, each provider is required to agree in writing that it is responsible for the accuracy of the Medicare claims submitted on its behalf and that all claims submitted under its provider number will be accurate, complete and truthful.

E. MEDICARE DOCUMENTATION AND PHYSICIAN PRESCRIPTION REQUIREMENTS FOR DME

42. Prior to dispensing durable medical equipment, DME suppliers must have in their possession certain items of documentation. For the knee and back braces that are the subject of this scheme, these pieces of equipment may be delivered to a beneficiary upon receipt of a dispensing order. The dispensing order from a physician, nurse practitioner, or physician assistant (under some circumstances) may be verbal or written. The DME supplier must keep a record of this order on file, including the description of the item, the beneficiary's name, the prescribing physician's name, the date of the order, and the date and time of the verbal order including the DME supplier's signature. If it is a written dispensing order (i.e., a "prescription")

18

the physician must have signed the written order. This documentation must be maintained by the supplier. CMS Manual System, Pub. 100-08, Medicare Program Integrity Manual, Chapter 5, § 5.2.2.

43. In addition to this "prescription" a detailed written order is required before the supplier may submit a bill to Medicare. While the supplier can produce the written order, the ordering physician must review it and sign and date the document. It also must contain the beneficiary's name, the physician's name, the date of the order, a detailed description of the item and the physician's signature and signature date. In addition, the prescribing physician must have information in the medical record demonstrating the medical necessity of the item as well as medical necessity for the frequency of use, etc.

F. PROHIBITION ON ROUTINE WAIVERS OF BENEFICIARY CO-PAYMENTS AND DEDUCTIBLES

44. Medicare prohibits routine waivers of co-insurance and co-payments. Under 42 U.S.C. 1395m(a)(1)(a), Medicare pays for covered DME items, in general, in an amount equal to 80% of the authorized charge amount. Because DME is provided under Medicare Part B, the patient is, in most cases, responsible for the 20% Part B co-payment. As discussed above, the routine waiver of a co-payment and deductible is prohibited as a violation of 42 U.S.C.1320a-7a, which prohibits the offer or payment of remuneration to the beneficiary by any entity if the entity knows (or should have known) that this remuneration is likely to influence a beneficiary to obtain an item, or to obtain it from a particular supplier.

G. Medicare Requirement for Coverage and Payment of Durable Medical Equipment [DME] Under Part B: 42 U.S.C. §1395m

45. Medicare pays for durable medical equipment (DME) under rules set out in 42 U.S.C. 1395m. Durable medical equipment is, under 42 CFR 414.202,

> . . .equipment furnished by a supplier . . .that (1) can withstand repeated use; (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury, and (4) is appropriate for use in the home.

46. In order to become a Medicare DME supplier, an entity must complete a CMS form 855S (Medicare enrollment application for durable medical equipment, prosthetics, orthotics and supplies.) In this form suppliers expressly certify the following:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.   [CMS 855S]

H. Medicare's DME "Cold Calling" prohibition

47. Under 42 U.S.C. 1395m DME suppliers are expressly prohibited from "cold calling" Medicare beneficiaries to solicit sales of DME supplies. In fact, in the absence of very specific circumstances, a DME supplier cannot make telephone contact with a Medicare beneficiary

about furnishing a covered item at all. In addition, the "non-solicitation" restriction is a specific

condition of payment under Medicare. 42 U.S.C. 1495m(a) states:

> 42 U.S.C. 1395m(a) Payment for Durable Medical Equipment.—
> . . .
> *(17) Prohibition against unsolicited telephone contacts by suppliers.—*
>
> > *(A) In general.—A supplier of a covered item under this subsection may not contact an individual enrolled under this part by telephone regarding the furnishing of a covered item to the individual unless 1 [sic] of the following applies:*
> >
> > > *(i) The individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item.*
> > >
> > > *(ii) The supplier has furnished a covered item to the individual and the supplier is contacting the individual only regarding the furnishing of such covered item.*
> > >
> > > *(iii) If the contact is regarding the furnishing of a covered item other than a covered item already furnished to the individual, the supplier has furnished at least 1 covered item to the individual during the 15-month period preceding the date on which the supplier makes such contact.*
> >
> > *(B) Prohibiting payment for items furnished subsequent to unsolicited contacts.—If a supplier knowingly contacts an individual in violation of subparagraph (A), no payment may be made under this part for any item subsequently furnished to the individual by the supplier.*

I. NATIONAL PROVIDER IDENTIFIER NUMBERS

48. Every provider of any type (e.g., physicians, hospitals, DME suppliers, other providers,

etc.) must obtain a National Provider Identifier in order to bill Medicare. The information

submitted in the NPI lists the principals involved in the entity, the type of entity, and other

important data in order to enable Medicare to be certain about the entity and underlying

individuals, corporate structure, etc. with which it is dealing. Applications for an NPI number is made on CMS form 10114. As part of the application, the applicant states:

> If I become aware that any information in this application is not true, correct or complete, I agree to notify the NPI enumerator [managing agency] of this fact immediately. I authorize the NPI enumerators to verify the information contained herein. I agree to notify the NPI enumerators of any changes in this form within 30 days of the effective date of the change.

49. The correct use of the NPI and updating NPI numbers to reflect the actual provider or claims submitter is a material condition of a Medicare claim and Medicare payment.

50. As identified above The Defendants and their enterprises actually operate under four National Provider Identifier numbers. Relator is informed and believes that Defendants may be billing under all of these numbers in order to keep their massive volume of sales less visible to CMS auditors.

J. MEDICAL NECESSITY

51. Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Under 42 U.S.C. § 1395y(a)(1)(A), and 42 U.S.C. § 1320c-5(a), the Medicare program authorizes payment only for DME that is "medically necessary"

**IV. SPECIFIC FRAUDULENT ACTS AND OMISSIONS OF DEFENDANTS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT**

A. CHRONOLOGY AND OVERVIEW OF RELATOR'S EXPERIENCES AT DEFENDANTS' ENTERPRISE

52. In November 2013, Relator began interviewing for employment with Defendant Western Medical Group, as Western Medical Group was in the process of hiring sales representatives for its medical supply business. The advertisements for sales representatives appeared typical and the earnings potential appeared to be solid. However, during the course of training for her position with Western Medical, Relator began to sense that aspects of the approach and how the enterprise operated were, at least, questionable. This concern was rapidly borne out by her experience, resulting in her being placed on administrative leave as of January 8, 2014, and subsequently terminated from employment.. During that time it became clear that the entire enterprise was based upon false representations to patients and fraudulent bills to Medicare.

53. The Relator attended corporate training for new sales employees on December 6, 2013.

54. This training was conducted by Mr. Dave Nolan, the enterprise Vice President of Sales. During the course of training, Nolan specifically discussed the following:

a. Nolan provided a broad overview of Medicare, Part A and Part B, as well as the idea of Medicare supplements.

    b.  The necessity of treating calls as "incoming" in order to evade Medicare regulations.

        i) During the course of training, Mr. Nolan indicated that all calls coming to the call center are to be referred to as "inbound leads."

        ii) He indicated that this was a "technicality" in order to circumvent Medicare restrictions and regulations.

        iii) The calls are inbound via a Philippines outbound call center company whose actual focus is on selling identity theft protection. Their call center is in Cebu, Philippines. It is this call center, operating under contractual or other arrangements for and on behalf of the Western Medical 'enterprise' that actually calls the patients as a "cold call" and then without the patient knowing transfers the call (without the consent of the patient) to the U.S. call center.

55. The new attendees/sales representatives were told to never "be a sales person," or let the patient know that you are a sales person.

    a. The representatives were instructed to call themselves, consultants, "QA representatives," calling in order to verify information and the like. Nolan stated words to the effect "let me tell you what needs to be in there:

- "These are benefits you are entitled to."

- "You are entitled to them through your insurance"

- "You are entitled to these braces and back supports."

    b. Attendees were advised to "position yourself" with concepts such as:

- "I'm part of your Medicare, Medicare wants to make you aware of this benefit."

- "I am part of your Medicare, Medicare wants to make you aware of this benefit;"

- "I am calling from Medicare;"
  "Medicare asked me to call you."

- You can inquire what they like to do and what is stopping them from doing it, keep asking until you get something about knee or back pain.

c. Representatives were instructed to find out quickly what the patient's Primary Care provider name was and indicate that the primary care provider wants them to have these braces and the Representative will work with the primary care provider. Representatives were told to then get the doctor's name and check the NPI number for the doctor (which the Representative could do because the NPI registry database was programmed to be visible as part of the Representative's screen data).

d. The Representatives were instructed to always assume there will be a sale, and say things such as "can you give Dr. Jones a call to give him a heads up that we will be faxing something to him."

e. The new sales representatives were told to indicate that the Medicare beneficiary on the phone line:

   i. "has a covered benefit of two knee braces and a lumbar support"" if your doctor agrees"

25

ii. The patients were told that these were provided "at no cost to you" but the reps were specifically told they cannot say "free."

iii. Reps were told that patients may get upset on the phone but the rep was to just be calm and focus on what the rep needs.

iv. They were told "it doesn't really matter what they [the patients] need." They were instructed that there were creative ways of obtaining information, including telling patients that if they didn't need them themselves they could always sell them on Ebay and make money reselling the braces.

v. Nolan said to use creative ways of obtaining the information, "they can sell them on Ebay, they can give them to the cat, I don't care."

vi. Nolan instructed the Reps that one way of building value into the product is to reemphasize to the patient, according to Nolan, "it doesn't cost you anything at all." Representatives were instructed to use phrases such as :

- "I can take care of all the paperwork for you,"

- "This is "a new covered benefit,"

- "You will be receiving the information from "our sister company,"

- "Your doctor knows you best and wants you to have this product,"

- "You will get a letter containing a covered benefit notification,"

    and such similar phrases designed to make the phone sale.

56. The Representatives were also instructed on how to deal with supplemental insurance and Medicare HMOs. They were told how to make sure that this information was collected so that private payors with Medicare supplement products were also billed in this scheme.

57. Nolan also outlined the "stages" of sales and processing of claims through the company, and what to get from the call recipients.  The sales process involved four steps.

a. Step 1 was when the representative got the call from the Philippines. The "selling" would take place in this phase.

b. Step 2 involved completing a computer screen form that included all necessary information to both process the claim and obtain a prescription from the beneficiary's physician. The sale was always made on the basis that this was "at no out of pocket cost" to the beneficiary. The physician's name would be obtained and while the beneficiary was still on the phone, the physician's NPI number would be pulled up on a screen at the sales representative's work station. Demographics would be obtained, the beneficiary's Medicare billing information would be obtained, etc.

i. In step 2 this would continue with an audio statement to the beneficiary that they were giving permission to use the beneficiary's medical records to authorize the purchase and contacting the physician.

ii. The beneficiary was told if they agreed to this they should state they name and the date, under the theory that this constituted consent.

iii. Often the beneficiaries were unable to state their name or give the correct date   and were coached on that by the sales representative.

iv. They were told that this constituted their electronic signature.

v. After this was accomplished, step 2 continued with bringing "quality assurance" on the line with the beneficiary and confirm that that they had given their consent for the company to contact their physician to obtain a prescription for the support.

vi. Previously, the sales rep had coached the beneficiary to say "yes" to this question. However, some beneficiaries did not so respond, and would question what was going on.

vii. At that point "QA" would go off the line and the sales rep would come back on the further coach the beneficiary.

viii. This back and forth between the sales rep and QA would continue as long as necessary until QA received the correct response.

c. Step 3 involved resolving any pending discrepancies in the sales order.

d. At Step 4, another part of the enterprise, Quality Assurance, would send the DME prescription to the physician for signature. Because this was a non-invasive, non-specific back brace and/or knee brace, physicians or their offices routinely signed these without question. At that point the sale was complete and Medicare was billed for the braces. At the same time, the order was sent to the warehouse for shipment and shipped to the beneficiary.

58. Mr. Nolan, concluding training on December 6th through December 7th in 2013 indicated that the key performance indicators were to handle 30 to 35 calls per day with an 80%

"conversion" rate (i.e., 80% of the 30 to 35 calls would result in a sale) for an average of 3 sales per hour.

59. Relator then engaged in the occupation for which she was hired for approximately 3 weeks, operating (as directed) primarily from a "script" provided as part of training.

60. During that time, as documented further in this complaint, relator became increasingly uncomfortable and disturbed by what she was doing and the way the enterprise interacted with vulnerable elderly Medicare patients

61. Representatives were taught that in order to avoid CMS "Cold Calling" restrictions, the script referenced the fact that they were just talking to a company called PrivacyMax, through the call center in the Philippines. This ruse was used to make it appear that this was an inbound call from the Medicare beneficiary, when, in fact, it was not.

    a. The script which representatives were given from which to work stated, "you just spoke with one of the Identify Theft reps and they transferred you over to me. I am part of the quality assurance team and I just need to verify that your information is correct."

    b. The instructions then follow, "it is at this point you would transition into the braces by asking if they had received their packet of information yet."

    c. Through this ruse, the elderly, vulnerable Medicare beneficiaries are led to believe that there had been some other call placed and they requested a transfer of the call when in fact they did not.  However, in many cases the script was not followed and the back braces simply were the sole topic of the conversation.

d. Representatives were trained to use the script but that it really doesn't matter since the Medicare beneficiary will sound confused.

e. Nolan stated that this was "because we are really just like calling them directly."

f. The Reps were taught by Nolan that "sometimes they get confused about the whole PrivacyMax thing, it's just a way to avoid calling them directly here in the U.S."

g. Nolan stated that he would just drop it sometimes because "it doesn't make any sense anyway."

h. The call center would then transfer the call to Defendant's enterprises in American Fork, Utah.

i. The sales representatives would represent themselves to be "quality assurance" or "with a sister company performing quality assurance to verify the address", thus hiding both the call transfer and their true identity and objective from the Medicare beneficiary. They would then transition into the sales pitch for the back and knee braces.

j. All calls were logged as "incoming calls."

62. To the best of Relator Boucher's information and belief, the Cebu, Philippines, call center initiated calls based on procured telemarketing lists, address, and phone numbers of individuals over the age of 65.  Most, if not all, of these calls were based upon the ruse that these call recipients were "eligible for a free trial of identity theft protection."

63. During training, and further during staff meetings, Defendants and their management addressed the issue of contacts "balking" at giving their Medicare number, which is the same as a Social Security number. They were trained to "build value" into how much the product will

help them. They were told to "just ask if you can do this for them; it doesn't matter if they need it." Sizes were estimated simply on the basis of height and weight

64. During the course of Relator's short employment, she kept notebooks of her contacts, phone calls, and the extensive "pushback" from many call recipients. These included specific cases that indicate that the patients had not initiated the call but that it was a "cold call" and that many patients did not want the product. Others bought the product on the basis of the telephonic solicitation and promise of waiver of any co-pay or deductible.

B. Specific examples of sales / claims to Medicare in furtherance of the scheme

65. The following listing identifies a representative sample of those contacts made by Relator pursuant to the directions of her employer.  In each of these cases, the elderly Medicare recipient was contacted on the basis of an outbound call from Cebu, Philippines which was then transferred to the call center in the U.S. In each of these cases, at the direction of the defendants, specific reference was made to the fact that these braces would be provided at no out-of-pocket cost to the Medicare recipient. [1]

_____

[1] The precise identity of these Medicare Beneficiary sales contains potentially protected individually identifiable health information and/or protected health information as defined in 45 CFR § 160.103 and as used in the Health Insurance Portability and Accountability Act (HIPAA) privacy rules. It has been disclosed to the Relator's counsel under the provisions of 45 CFR § 164.502 (j)(1), and is disclosed by the Relator through counsel to the  Department of Justice under the same provisions. In order to protect privacy of the patients, they will be referred to by alphabetical and numerical identifiers. The actual information has been provided to the U.S. attorney with this complaint.

66. In each case, the required information was obtained by Relator to effectuate the "sale" and complete billing to Medicare. The call was transferred to "Quality Assurance" in Defendants' Enterprise. Relator Boucher is informed and believes, on the basis of standard protocol in Defendants' Enterprise, that Quality Assurance produced a physician order form ready for signature by the beneficiary's physician and electronically transmitted these documents to the physician. Relator is further informed and believes, on the basis of standard procedure in Defendants' Enterprise, that these documents were received or returned and claims submitted to Medicare for reimbursement at standard Medicare DME prices.  Relator Boucher's confidence in these other steps is high because she was credited with a completed "sale" prior to her departure from Defendants' Enterprise. This crediting with the "sale" could not have taken place without the completed transaction and claim to Medicare.

67. Sales made by Relator include:

| | | | |
|---|---|---|---|
| 12/13/2013 | E B | 409-985-4989 | Port Arthur, TX |
| 12/13/2013 | C E | 660-376-2861 | Maraline, MO |
| 12/13/2013 | S L | 803-685-3725 | South Carolina (Dr. Identified) |
| 12/13/2013 | B H | 626-399-9454 | San Gabriel, CA |

| 12/13/2013 | K W | 248-634-7999 | Holly, MI  (Dr. Identified) |
| 12/18/2013 | A F | 480-832-4439 | Chandler /Gilbert, AZ |
| 01/01/2014 | E W | 707-939-2706 | Santa Rose/Fairfield, CA |
| 01/04/2014 | J H | 502-839-5640 | Lawrenceville, KY |

C. SCHEME TO MAKE REPEATED UNSOLICITED CALLS TO MEDICARE BENEFICIARIES

68. During December 2013, Relator became aware that the programming of the computers appeared to have been changed in order to classify a "hang up" (a call where the phone was answered and the recipient of the call immediately hung up the phone) into a "dropped call" (a call where the phone system itself failed to complete the call or it was inadvertently disconnected), and the same phone number was recycled through the Cebu, Philippines co-conspirator and placed back in the outgoing call queue.

69. Relator became aware of this because of the vast increase in extremely distraught call recipients, some crying on the phone, asking why they were getting many calls a week or even a day, from this same number.  Thus, the Medicare recipients who clearly did not wish to talk were nonetheless being repeatedly "call slammed" with multiple repetitive calls. Relator further became aware that these Medicare recipients could not have placed an incoming call because they were so distraught about being contacted at all.

70. In furtherance of hiding this scheme, on January 3, 2014, at 3:15 p.m., representatives were informed that the "caller ID" had been changed for all calls in the company. This is the identification that will appear on a call recipient's caller ID when the Philippines call center placed the call or when Defendants' sales Representatives called a beneficiary. Thus, Defendants engaged in a deliberate and concerted effort to conceal from recipients the identity of the enterprise making the cold call to their phones.

71. Defendants' demand and scheme to treat every telephone call in the Enterprise as an "inbound call" was further demonstrated by Relator's personal experience. On or about January 3, 2014, Relator Boucher was tasked with making a number of outbound calls in follow-up to the falsely coded "hang-up" that were treated as "dropped calls." In making these outbound calls, she logged those in her computer system as outbound calls. Shortly thereafter, she was reprimanded by her supervisory staff and sales vice president for logging calls as "outbound." She was specifically instructed that whether or not she placed the call, all calls were to be logged as "inbound" in the computer system.

D. SPECIFIC EXAMPLES OF THE FRAUDULENT STATEMENTS MADE BY DEFENDANTS' EMPLOYEES AT THE DIRECTION OF DEFENDANTS IN ORDER TO CARRY OUT THE SCHEME

72. On January 3, 2014, following Relator's conversation with Dave Nolan, Relator ceased getting any phone calls routed to her extension, thus cutting off her ability to further participate in sales.  That afternoon, Relator circulated among other desks and heard representatives speaking to Medicare beneficiaries. In some cases, Reps purported to give

medical advice to beneficiaries in order to promote the product and an immediate sale. Among

other conversations, Relator overheard the following:

a. *Heather:*

- "I'm calling on behalf of Medicare."

- "No, no, we are not a sales company."

- "Oh no, you're not buying anything."

- "As a set--I'm, I am sending all 3, your doctor decides."

b. *Molly:*

- "Medicare asked me to call you."

- "Oh no, it's not meant for chronic arthritis. You see, by then it's too late."

- "This is to prevent these type of problems . . ."

- "No, No. It's too late once things have progressed."

- "I just am going to fax your doctor. . . ."

- "No, no, we need to let your doctor decide what's best."

c. *Max:*

- "You can sell them on Ebay."

d. Alan:

- "Oh you don't have to need them now, just to have them around for the

  future."

E. SCHEME TO CAUSE THE MEDICARE BENEFICIARY'S TREATING PROVIDER TO PROVIDE "PRESCRIPTIONS" FOR THE DME BY FALSE REPRESENTATIONS

73. In order to further this scheme, defendants' enterprise routinely produced the paper written order for the physician's signature and faxed or forwarded this document to the beneficiary's physician. Relator is informed and believed and therefore alleges that these communications were accompanied by written or telephone communication from the portion of the enterprise producing these documents to the effect that the patient had contacted the enterprise and had requested a prescription for these items. On the basis of this request from the beneficiary, the physicians or their office staff routinely and nearly universally simply executed the request as prepared by the defendants. In communicating this purported false request by the patients, (and in the event the patients did request it, that request was procured by a promise of a routing waiver of the co-payment) defendants knowingly caused the physicians to produce a false record or false document in support of defendants' claim to Medicare. Such falsely procured written order was an integral part of the documentation underlying defendants' fraudulent claims to Medicare.

F. DEFENDANTS SUBMISSION OF CLAIMS AND FALSE CERTIFICATIONS OF COMPLIANCE WITH MEDICARE REGULATIONS AND CONDITIONS OF PAYMENT

74. With respect to each of these "sales," including the "sales" specifically identified in this complaint, defendants' Enterprise submitted a claim for payment to Medicare, in order to

request money from the United States Government for the equipment sold. On information and belief, these claims were submitted to the Medicare regional administrative contractor for Utah, Noridian Healthcare.

75. With respect to each of these requests for payment, in submitting the claim Defendants both expressly and impliedly certified that:

a. The claims were submitted in accordance with the representations in the CMS 855S, namely that their submission and payment of a claim is conditioned upon the claim and the underlying transaction complying with the laws, regulations and program instructions that apply to the Medicare program, including but not limited to the anti-kickback statute;

b. the underlying transaction and their contact with the beneficiary complied with 42 USC 1395 m(a);

c. the claims for payment were for DME products that were reasonable and necessary for the treatment of illness or injury, and that the durable medical equipment supplied was medically necessary.

76. At the time each claim was submitted, defendants had actual knowledge that such claim was false or acted in reckless disregard of the truth or falsity of the express and implied representations connected therewith. Defendants knowingly and intentionally created a system to submit such bills to the government in knowing and intentional disregard of the truth or falsity of their compliance with both the specifics of the claim and the underlying transaction.

77. Each of the claims submitted for payment was the result, in addition, of violations of the Anti-Kickback Act in that each Medicare beneficiary was specifically told that these items of

durable medical equipment would be provided them "at no out-of-pocket cost to you." This constituted a routine waiver of the Medicare beneficiary's copayment with respect to these items of durable medical equipment. Such a routine waiver constitutes a violation of the Anti-Kickback Act. Each claim submitted by defendants in furtherance of this scheme expressly contained certification of compliance with the Anti-Kickback Act. In addition, independent of said certification, violation of the Anti-Kickback Act renders each such claim a false claim.

## V. DEFENDANTS' RETALIATION AGAINST RELATOR FOR MAKING MANAGEMENT AWARE OF SPECIFIC AND MATERIAL VIOLATIONS OF FEDERAL LAW AMOUNTING TO CRIMINAL ACTS

78. On January 3, 2014, at 1:05 p.m., relator met with Dave Nolan concerning her discomfort with the job and what the Company was doing. Nolan began the conversation by being patronizing and chastising her about her "low conversion" and stating "I'm becoming very uncomfortable with what you are trying to say."

79. After becoming visibly upset to the point that relator became fearful of personal bodily harm from Nolan, relator specifically told Nolan that "you are cold calling Medicare patients to sell them DME products and that's a felony."  Nolan replied, "Well, they're all inbound calls."

80. Relator again made clear reference to the fact that there is "cold calling going on and that is exactly what we are doing through the Philippines." Nolan replied words to the effect that "well, this is a whole other thing, if you are not comfortable with what we do here then maybe

you should leave." After further heated conversation, he indicated that he would take the entire matter to Jody Rookstool, and go from there.

81. Relator heard no further information concerning her concerns. Rather, on January 8, 2014, relator was informed that she was placed on administrative leave, all her access to her work communications, locations and emails were cut off and her belonging were removed from the premises.

82. She was unable to continue in her employment and was, for all practical purposes, terminated from her employment. She had no opportunity to earn any commission, and was "demoted." As of the date of this complaint she has not been returned to any position in the company and has been terminated. In addition, Defendants have retaliated against Relator and continue to retaliate. Defendants have willfully and intentionally disparaged her to future potential employers, and in one case, the disparagement and retaliation caused a termination of employment that Relator had already secured subsequent to her termination from Defendants' Enterprise. Each of these acts was carried out willfully and maliciously as a result of her lawful efforts to curb Defendants' unlawful conduct including conduct amounting to federal criminal activities.

## VI. SCOPE OF THE FRAUD

83. On January 3, 2014, representatives were told that sales had "dropped from 1,173 to 850 per day in 24 hours." Executive management of the enterprise wanted to know why sales had dropped and wanted to "get to the bottom of this." Thus, the expectation and historical

behavior of the fraudulent enterprise averaged over 1,000 sales per day, at an expected revenue loss to Medicare of $2,000.00 per sale unit. ***This amounts to fraudulent billing to Medicare of between $1.7 million and over $2.2 million per day.***

84. This statement by Management also confirms the Company's expectations as described in Relator's training. Each of the 60+ Reps were expected to field 30 calls per day, or an Enterprise total of 1800 calls per day. At a "conversion rate" of 80%, the Enterprise would have made 1400 sales per day.

## VII. CLAIMS FOR RELIEF

### COUNT I –VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

85. Relators incorporate by reference Paragraphs 1- 84 of this Complaint as though the same were set forth herein at length.

86. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth presented false and fraudulent claims for payment for DME services provided to patients insured by federally-funded health insurance programs, including Medicare. When they submitted claims for payment and approval to CMS or its Contractor for Durable Medical Equipment, Defendants, both expressly and impliedly certified to CMS that the claim was submitted in compliance with Medicare laws, rules and regulations, despite Defendants' violations of the Medicare Anti-kickback Law, Medicare "Cold-Calling" prohibition, and billing for medically unnecessary Durable Medical Equipment.

87. All of the representations and certifications, both express and implied, contained with respect to each bill to Medicare or its contractor, had a natural tendency to influence Medicare's decision whether to pay the claim and was material to the payment of the claim. Further, had Medicare known of the defendants' intentionally created scheme and the falsity of the statement contained therein, Medicare would not have paid said claims.

88. As a result of these schemes, Defendants caused Medicare and the other government payors to incur significant damage and those damages are continuing to accrue.

### COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

89. Relators incorporate by reference Paragraphs 1-88 of this Complaint as though the same were set forth herein at length.

90. Defendants knowingly, in reckless disregard and/or or in deliberate ignorance of the truth made, used and/or caused to be made or used, a false record and statement material to a false and fraudulent claim to obtain approval and payment from the Government when they submitted claims for payment by creating the written orders submitted for signature. The physicians or their office staff routinely and nearly universally simply executed the request as prepared by the defendants. In communicating this purported false request by the patients, (and in the event the patients did request it, that request was procured by a promise of a routing waiver of the co-payment) defendants knowingly caused the physicians to produce a false record or false document in support of defendants' claim to Medicare. Such falsely procured written

order was an integral part of the documentation underlying defendants' fraudulent claims to Medicare.

91. CMS and other Federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid for these services.

92. All of the representations and certifications, both express and implied, contained with respect to each bill to Medicare or its contractor, had a natural tendency to influence Medicare's decision whether to pay the claim and were material to the payment of the claim. Further, had Medicare known of the defendants' intentionally created scheme and the falsity of the statement contained therein, Medicare would not have paid said claims.

93. As a result of these schemes, Defendants caused Medicare and the other government payors to incur significant damage and those damages are continuing to accrue.

## COUNT III – VIOLATION OF 31 U.S.C. 3729(a)(1)(C)

94. Relators incorporate by reference Paragraphs 1-93 of this Complaint as though the same were set forth herein at length.

95. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth conspired between themselves with their employees and administrators, and others, (including the Cebu, Philippines call center) to present and/or cause to be presented false and fraudulent claims for payment and approval for services delivered or purported to be delivered to patients insured by federally-funded health insurance programs, including Medicare, Tricare,

Federal Employees Health Benefits Programs and other such programs, as detailed above.

96. CMS and other Federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid for these services.

97. All of the representations and certifications, both express and implied, contained with respect to each bill to Medicare or its contractor, had a natural tendency to influence Medicare's decision whether to pay the claim and were material to the payment of the claim. Further, had Medicare known of the defendants' intentionally created scheme and the falsity of the statement contained therein, Medicare would not have paid said claims.

98. As a result of the conspiracy, Defendants caused Medicare and the other government payors to incur significant damage and those damages are continuing to accrue.

**COUNT IV – VIOLATION OF 31 U.S.C. 3729(h)(RETALIATION)**

99. Relators incorporate by reference Paragraphs 1-88 of this Complaint as though the same were set forth herein at length.

100. Prior to and including the date of her termination, Defendants progressively retaliated against Relator by cutting her compensation, harassment, significant adverse changes in work duties and responsibilities, placing Relator of "administrative leave," intentionally terminating her employment, interfering with her subsequent employment opportunities, and other adverse treatment.

101. The foregoing retaliatory acts of defendants were performed willfully, intentionally

and with reckless indifference to plaintiff's protected rights.

102. Relator in observing and documenting her training and other occurrences in the workplace was engaged in protected activity, while simultaneously carrying out her workplace duties.

103. Relator, during the above-described meeting with Defendant Nolan, and prior to any indication of performance shortcomings in her job, expressly and clearly informed Nolan of the illegality under Federal law of conduct she observed and the criminality of some of the conduct. It was only after that point in the meeting that Nolan indicated that "this is an entirely different matter" and suggested that she needed to leave the company. Immediately following the meeting, retaliation against Relator began in that she was no longer receiving sales calls and was cut off from telephone contact with potential customers. Within days she was placed on "administrative leave" under the pretext of the Enterprise "investigating" her concerns. In fact, she was, very shortly thereafter, terminated.

104. Defendants' conduct in carrying out these acts was fully motivated by her protected activity and protected communications and fully motivated by a desire to retaliate against Relator for these protected activities.

105. As a result of Defendants' actions, Relator has suffered and continues to suffer substantial damages. Relator's damages include lost earnings and wages, as well as workplace disparagement with regard to other employment prospects. Relator is informed and believes and thereupon alleges that Defendants interfered with and caused her termination from employment which she had secured subsequent to her termination from Defendants' Enterprise. Defendants' defamatory and disparaging communications to others in the medical equipment and medical

supply industry are part of an ongoing pattern of retaliation.

## VIII. PRAYER FOR RELIEF

106. WHEREFORE, Plaintiff/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

A.  The amount of the United States' damages in an amount to be proven at trial;

B.  Treble the amount of the United States' damages in an amount to be proven at trial;

C.  Civil penalties of $11,500 for each false claim submitted, especially in view of the fact that the Defendants' fraud is so egregious as to justify debarment from all federal health care programs;

D.  Double back wages, interest on back pay, reinstatement with the same seniority status, and special damages sustained as a result of the retaliation and any other damages as proven at trial and allowed by law under 31 U.S.C. § 3730(h) for retaliation against Relator;

E.  Reasonable costs and attorney's fees;

F.  The maximum allowed to Relators under 31 U.S.C. § 3730(d);

G.  Trial by jury as to the allegations against each Defendant; and

H.  Such other and further relief as this Court deems to be just and proper.

## IX. REQUEST FOR TRIAL BY JURY

107. Pursuant to Rule 38, Federal Rules of Civil Procedure, a jury trial is requested .

Respectfully submitted,

Robert D. Sherlock (02942)
EISENBERG, GILCHRIST & CUTT
215 South State Suite 900
Salt Lake City, Utah 84111
Telephone:      801-366-9100
Facsimile:      801-350-0065
rsherlock@egclegal.com

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with F.R. Civ. P. 4(i) and the requirements of 32 U.S. Code 3730(b)(2), and 28 C.F.R. 0.77(i), on this 11th day of February, 2014, I mailed, via registered United States Mail, a copy of the foregoing Complaint together with any exhibits thereto, to the following:

United States Department of Justice-
Attorney General of The United States
C/O Assistant Attorney General for Administration, Justice Management Division
950 Pennsylvania Ave. NW, Room 1111
Washington, D.C. 20530

And hand- delivered or caused to be hand-delivered the same to the following:

Hon. David Barlow
United States Attorney for the District of Utah
Attn: Civil Frauds/ False Claims
185 So. State Street
Salt Lake City, UT 84111

_____
John Layton